[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband, Alexander K. Bochain, commenced this action for a dissolution of the parties' marriage on the ground that it had broken down irretrievably. In his complaint he also seeks custody and support of the minor child and an equitable dissolution (sic) of the marital estate. The defendant wife, Viktoria A. Bochain, admitted all of the allegations of the plaintiff's complaint, as amended, and filed a cross-complaint, also seeking a dissolution of the parties' marriage on the ground of irretrievable breakdown, custody and support of their minor child, alimony, a fair and equitable dissolution (sic) of the marital estate and other relief. As custody of the parties' minor child was seriously in dispute, the court, Hurley, J. appointed counsel for him, and the issues of custody and visitation were referred to the Family Relations Division for mediation, study, investigation, recommendation and report. All parties, including the child, were represented by counsel throughout these proceedings, including the trial.
The parties also filed financial affidavits, introduced into evidence a large number of documentary materials and testified. In addition, the family relations officer testified; the wife's parents, friends, acquaintances and associates of the parties and employees and former employees of the husband's restaurant-bar business also testified. The wife's supervisor at CT Page 190 her furniture store employment and a real estate appraiser also testified. All of the parties filed written proposed orders, and the husband and wife filed post-trial briefs. From this evidence, the court finds the following facts.
The husband married the wife in Stonington, Connecticut on December 11, 1983. Her maiden or birth name was Viktoria Galor. The parties have resided continuously in this state for at least one year before the date of the plaintiff's complaint. They have one minor child, issue of the marriage, Kippery Paul Bochain, whose date of birth is September 8, 1985. No other minor children were born to the defendant wife since the date of the marriage. Neither parent or the child has been the recipient of public assistance. All statutory stays have expired and this court has jurisdiction.
This marriage is the second for both; their first marriages ended in divorce. The husband is 48 years of age, in good health, and received a bachelor's degree in business administration. He currently holds real estate broker's licenses in both Connecticut and Massachusetts. He describes himself as an investor, and he buys, sells and rents real property, and owns and manages real estate, either individually or as a partner, tenant in common or joint venturer with others. He also has owned and operated a restaurant and bar business.
The wife is 37 years of age, in good health, and has an associates' degree in architecture and mechanical engineering from a two year college. She worked in the husband's restaurant-bar business for a number of years in various capacities, including manager, and for a few months at the Foxwoods Casino. She has been steadily employed as an interior decorator at a local furniture store for about one year.
This marriage of over ten years was dysfunctional from the very start. The court received a plethora of testimony from the parties and their witnesses, most of which attacked the character and behavior of the other party. The husband's evidence called the court's attention to the wife's abuse of alcohol and drugs, to her verbal attacks and insults of him, and to her adulterous affair in the spring of 1992, which was admitted by her. Much of the evidence relating to her substance use and abuse came from employees or former employees of his restaurant-bar business, some of whom were drug addicts and/or abusers, and two of whom the wife fired. Much of the evidence CT Page 191 relating to her substance use and abuse occurred on the restaurant premises, and involved these very employee-witnesses, and the court infers from the testimony that the husband either was aware of the drug culture in his place of business and condoned it, or at the very least, turned a blind eye toward it.
At the same time, the wife's testimony painted the husband as a drug user and excessive drinker, to the point of being an alcoholic, and becoming intoxicated on a number of occasions. She also described him as non-communicative with her and verbally abusive of her. She also directed the court's attention to an occasion when the husband physically assaulted her, which required the intervention of the police. This assault was apparently provoked by the wife leaving their child home alone for about 15 minutes to look for the husband who was out drinking. The police arrested the husband, but did not take him into custody because of the further intervention of the wife's father. He allowed the husband to come home with him and was able to defuse the situation at that time. No harm came to the child.
The parties have clearly showed that the marriage has irretrievably broken down, with no reasonable likelihood of reconciliation, and have in fact admitted it in their pleadings, and filed a written signed stipulation to that effect. The evidence also clearly shows that both parties richly merit the responsibility for the breakdown of their marriage, and that neither has made any sustained reasonable effort to repair the marriage. The court also finds from the totality of the circumstances involved in this case, that the blame for the breakdown of this marriage belongs to the parties in equal proportions. While the court recognizes that the wife's adulterous affair would ordinarily be a betrayal of the marriage relationship, the court cannot agree that it was the chief cause of the breakdown of this couple's marriage. The one silver lining that has emerged from this unhappy scenario is that both parties have apparently resolved their respective substance abuse problems and have remained sober at least since this action was commenced in May, 1992.
Although the parties agreed on joint legal custody, the details of this too, were both strenuously and vigorously litigated during trial, as each party contended that each was the better parent to be awarded `primary' physical custody. Much of the same evidence and testimony as to each other's character CT Page 192 defects was stressed to show which parent would be the better principal or primary custodial parent. It is significant to note that the parties had agreed upon an arrangement, approved by the court, that the child would remain in the family dwelling, and that each parent would be with the child during alternating weeks. Apparently this arrangement has worked well for the child for the past year, and the child has suffered no obvious ill effects from it, and continues to do well at his private school. However, although the mother was willing to continue this in effect, the father was not, and neither party presented to the court a detailed parenting plan which would allow this schedule to continue indefinitely into the future. Hence, on this point, the court must reluctantly agree with the opinion of the family relations officer, that that `shared dwelling' plan, which would allow the child to remain in familiar surroundings and provide him with personal stability, would not be practical or practicable, under the circumstances of the parties in this case, and their current mindsets.
The family relations officer, Linda Yuhas, whose reports were made exhibits, recommended that the `primary physical custodian' of the child be the father, and further recommended that the mother have liberal rights of access and visitation. Ms. Yuhas concluded that both parents were close in parenting ability, and that they had equal strengths and weaknesses. Both parents told her that each was the primary caretaker of the child in past years; that each did the greater share of the cooking, clothing, washing, getting the boy ready for school, getting him to medical appointments, and the like. The child's attorney essentially agreed with Yuhas' recommendation, and argued in support of it, and submitted a detailed residential custody and visitation plan and proposed orders. This court disagrees.
Both parents are intelligent and articulate, and have much to offer their son. He loves them both, and the court is certain that they love him. As Yuhas cogently observed in her report completed March 31, 1993, Plaintiff's Exhibit C, at page 7:
 Kippery is struggling, but coping. This may be because he is getting more positive attention from room and from dad than he did before the divorce process began. It appears that neither parent really grasped the CT Page 193 sacrifice and lifestyle changes which this society expects of parents until they realized that their lives were to come under scrutiny. Now both seem to be trying hard. One can hope that this is because they have realized and wish to rectify their past mistakes, rather than because they want to make a good impression on the Court. Clearly, Kippery needs them both.
The family relations officer clearly had a very close question to call, and appeared to base her recommendation on the greater flexibility of the father's weekday schedule, as the mother had a `9 to 5' job. In any event, the testimony of mother's supervisor, which the court finds credible, makes it clear that the mother has substantial flexibility in her work schedule, and can do much of it from her home, or at times when the child does not require her at hand.
The husband's claim for primary physical custody mostly relies upon his description of the mother's behavior; he also claims that he is a more effective disciplinarian, and spends more quality time with the child. There is no question that the court must take into account each parent's past behavior. See Yontef v. Yontef, 185 Conn. 275, 283 (1981). In this case, their past behavior toward each other and the extent of harm and damage done by each to their marriage, and presumably the child, is in balance.
The test is not which of the parents was a better parent and custodian in the past, but which would be the better primary custodian now. As the court said in Yontef, supra at page 283, ". . . (the court) must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the (child's) growth, development and well-being."
As stated, the parties have agreed on joint legal custody, and have actually operated under the framework previously discussed. General Statutes 46b-56a(a) provides in part: ". . . (J)oint custody means an order awarding legal custody of the minor child to both parents, providing for joint decision-making and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents." General Statutes 46b-56a(b) CT Page 194 provides that a presumption arises in such cases (where the parents agree to it) that such joint custody is in the child's best interests. In this case the anger and animosity of the parents toward each other is both palpable and evident. The husband can barely bring himself to look at the wife, while she appears willing to put her anger aside when their son's best interests are in issue. He is rigid and somewhat inflexible, while the wife is less so. She is able to make accommodations and remains willing to discuss all matters relating to the child with the father, while he remains totally incommunicative with her, and is unwilling to speak with her in a meaningful manner, even where it concerns the interests of their son. He has also limited the boy's relationship and contact with his maternal grandmother, which is contrary to his son's best interests. It is also highly significant to note that the husband has disobeyed an order to pay alimony not once, but twice and is now in arrears in the amount of $7,000 as of December 29, 1993, the filing date of the post trial briefs and the date the trial was therefore completed.[1] The parties during the litigation also engaged in improper activities which wasted much time and effort of the parties, their attorneys and the judicial system, which could have been devoted to far better use. These actions included the taking by the wife of business records from the husband's business premises, and cash and other items from his safe, and the illicit taping of the wife's telephone calls by the husband. All of these extra-legal activities were the subject of pendente lite motions and stipulations and also consumed time unnecessarily during the trial and obscured the real issues.
This court also presided over a vigorously litigated issue at a pendente lite hearing to determine whether the child should be continued in his private school which he had been attending for the past two years, or moved to the public school for the fall semester. It is unnecessary to repeat the findings and ruling of the court with respect to that controversy; to the husband's credit, he now concedes that the wife's decision to retain the child in his private school was for the best; however, in the court's view, that very hearing and its nature, when considered in the light of the foregoing findings, makes the outlook of joint legal custody, with the ideal of joint decision-making as called for in the statute, extremely improbable, without some modification. The court also finds that the husband's explanation at trial for his opposition to the child's continuation in the private school in which the child had been, and was, doing well, under the circumstances of this case, CT Page 195 disingenuous and unconvincing.
The court concludes that the mother's flexibility, her attention to the boy's educational, medical and emotional needs, and her willingness to accommodate her schedule to meet the needs of the child, and to attempt discussion with the father of matters involving their son would better promote his education, growth, development, well-being, and his best interests, as a whole. The court notes that the child has a strong and committed and loving relationship with his maternal grandfather, with whom he spends some time with every week, from Friday afternoon after school through Saturday afternoon, and the court finds that it is of the utmost importance to the boy that this relationship be both encouraged and fostered. Both parents, the child's attorney and the family relations officer, Ms. Yuhas, agreed that this relationship should be continued. Mr. Galor seems to be, and has been, an island of stability to whom this boy can cling or turn to in times of stress. The court concludes that this relationship would be better protected if the mother were given the more dominant role in the child's rearing. This is especially so in the light of the father's demonstrated indifference to, and disregard of court orders to pay alimony, and his failure to foster his son's contacts with the maternal grandmother.[2]
The parties enjoyed a high standard of living, which included a waterfront home, pool and cabana, and numerous vacations abroad, including trips to Australia, Portugal and Brazil. The wife now earns from her interior decorating job, the sum of $546.57 per week gross, and $483.80 net. In addition, she receives net rental income from her three-family home at 43 Pequot Road, Montville, Connecticut of $84 per week, giving her a total net income of $567 per week. Interestingly, she does not show or make any reference to the alimony receivable from her husband, nor does she show the arrearage as an asset. She shows against this net income, $718 per week in expenses, plus about $80 per week toward her liabilities. This property was derived from her family, and she values it at $120,000 on her financial affidavit, less a mortgage of $72,000, with an equity of $48,000. Her other significant assets include the jointly-owned waterfront family dwelling at 1002-1003 Pequot Avenue, New London, Connecticut, which she valued on her financial affidavit at $400,000, but introduced an appraisal which valued the property at $251,000, which the court finds to be its value, with an equity of $170,000, two IRA accounts with a total balance of CT Page 196 $5,000, and a jaguar automobile valued at $12,000. She claims unvalued "equitable interests" in the husband's restaurant-bar business, his Jupiter, Florida home and other real estate owned by him, either solely, or with others. The wife's three-family home was mortgaged to the extent of $100,000 to purchase the waterfront home. The court finds that the wife was the driving force in the purchase of the waterfront family dwelling, and contributed the major share of the effort in finding and locating it and insisting that her husband assist her with the purchase. She also decorated it, painted it and oversaw its renovation. Her father, Mr. Galor, did much of the repair work. She has a much greater affinity for the home than Mr. Bochain, and no other really suitable home at the present where she can raise the child. At the same time, Mr. Bochain has a number of housing resources, including his apartments and his parent's unoccupied home in Mystic, which are available to him.
Against these assets, the wife shows $19,629 in liabilities, which include $10,229 due to her prior attorney, but do not include the billing from her present counsel, which as of the date the taking of evidence concluded, amounted to almost $10,000.
The husband's financial picture is vastly, more complex, and to a great extent, inaccurate and misleading. He shows $166 per week of income taken out from the Thames Landing Oyster House (husband's restaurant-bar business previously referred to), and further claims that he no longer receives any income from that business, excepting his health insurance which also covers his wife and child. He testified that he "turned the restaurant over" to a Mr. Kogut, under a proposed agreement, which is not signed. See Plaintiff's Exhibit B. It should be noted that the plaintiff is a one-third (1/3) owner of the real estate and building in which the restaurant is located, (his father and one Micengendler also own one-third (1/3) each), and a two-thirds (2/3) owner of the stock in a corporation which owns the restaurant. Although the corporation still occupies the restaurant space and conducts business, it does not pay rent. The plaintiff husband shows additional net income of $526 from his rental properties giving him total net income of $638 per week. The husband shows on his financial affidavit $35,443 in outstanding liabilities of the corporation as his own personal liabilities, which is untrue. Even if it were true, and he was personally liable for these obligations, either consensually or by statute, which is not the case, he would only be liable for CT Page 197 two-thirds, or at least have the right of contribution from the other stockholder. He also lists liabilities for the real estate at 2 Captain's Walk, New London, of $11,879, which are also overstated, as he fails to explain either that he is only responsible for one-third, or is entitled to contribution for the other two-thirds of the $11,879 from his co-owners.
His evaluation of Port City Realty is also suspect, together with his statement that a mortgage of $100,000 is owed with respect to that property, when in fact there is no mortgage at all. In regard to the Jupiter, Florida property, he claims that the value of the property is $279,000; the wife claims that it is in an area of prestige homes and should be worth much more. He amended his original statement that there was a mortgage balance of $236,000 to a balance of $110,000, but claimed that he owed his father approximately $62,786 towards `improvements and carrying costs', and therefore has no real equity in the property. There is no note or written agreement concerning this claimed debt, and the court does not find it credible, and finds that the husband has a minimum of $85,000 equity in that property. Recasted, and accepting the balance of the husband's values for his various properties, the husband has assets as follows:
 13 Main St., Colchester, Ct. $ 209,600 15, 17, 19 Main St., " " 163,000 Norwich Ave., " " 150,000 1002-1003 Pequot Ave., N.L., Ct. (1/2) 85,000 98 Colony Rd., Jupiter, Fl. (1/2) 85,000 9 Pearl St., N.L., CT (1/2) 18,500 Mitchell Court, N.L., CT (1/2) 33,750[3]
2 Captain's Walk, N/L., CT (1/3) ?[4]
High Country Estates, Tolland, CT (1/6) 100,000[5]
Port City Realty (1/3) 100,000[6]
Total: $ 944,850
The three Colchester properties by the plaintiff were acquired over a number of years prior to the marriage of the parties, and have appreciated in the aggregate approximately $200,000 over their purchase prices. The others, with the exception of Port City Realty and High Country Estates and the family dwelling also were acquired before the marriage, including those in which the husband holds fractional or partnership interests. There was no evidence as to the values CT Page 198 the `pre-marital' properties as of the date of the marriage. The High Country land subdivision has five subdivided commercially zoned lots, and a large undeveloped parcel of land. Recently, the husband closed a transaction in which he sold a five-acre parcel from this holding to the United States Navy for $200,000. This transaction did not appear on his financial affidavit. Aside from the High Country Estates property, none of the other commercial properties have appeared to appreciate significantly in value from their purchase prices.
Although the defendant wife devoted a substantial portion of trial time to an attempt to show the availability of large amounts of cash to the plaintiff from his restaurant-bar business, and clearly demonstrated that the husband kept two sets of books, and that much cash was not in fact strictly accounted for, as many checks were made payable to `cash', she has not shown by the weight of the evidence that the husband was actually taking cash either directly, or indirectly for his benefit from the business. Nor has the defendant shown that the husband had in his possession large amounts of cash readily available to him, which were not accounted for, except in the sole instance when she discovered some cash in the restaurant safe. Nor, was there any analysis by an accountant or an auditor which showed that any amount of cash from that business stuck to the husband's fingers, and was not reported as net income to him. However, the court has concluded that the husband's net rental income as shown on his financial affidavit, when compared with his 1992 federal income tax return (Plaintiff's Exhibit G) appears substantially understated. His net rental income as shown on his return for 1992 is $45,103. To this must be added back depreciation of $12,316, after subtracting the $3,176 loss attributable to the Mitchell Court property, he would have a net cash flow of about $54,000 per year, or $1,040 per week, almost double the $526.66 net rental income listed on his affidavit.
The wife's financial affidavit also contained inaccuracies and omissions: her $3,200 IRA account, jewelry, some allegedly owned by her mother, some by her, and Series E and zero coupon bonds, claimed to be held for the child. It is clear that the inaccuracies and omissions in the husband's financial affidavit were far greater and cast grave doubt on his description of his financial condition.
 Our cases have uniformly emphasized the need for full and frank disclosure in that CT Page 199 affidavit. A court is entitled to rely upon the truth and accuracy of sworn statements required by 380 (now 463) of the Practice Book, and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. These sworn statements have significance in domestic disputes in that they serve to facilitate the process and avoid the necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence.
(Internal quotation marks and citations omitted.) Billington v. Billington, 220 Conn. 212, 219-220 (1991). ". . . (C)ompliance with the rules concerning the filing of financial affidavits is essential in order for the court to make a reasoned decision with respect to (financial) orders." Grayson v. Grayson, 4 Conn. App. 275,287 (1985). Here, the actions of the husband, and those of the wife to a far lesser degree, have done a disservice to themselves and to the court, by hampering the court's ability to determine their true asset and income picture.
The court finds from the evidence that the wife has an established earning capacity and ability of $27,500 per year, plus her rental income from her three-family dwelling. She also earned comparable salaries while employed at the husband's restaurant. See tax returns, Plaintiff's Exhibits E, F and N. It is also significant to note from a review of these same exhibits, together with husband's 1992 federal income tax return (Plaintiff's Exhibit G), that his net rental income, as shown on the returns, has more than doubled between 1990 and 1992.
The court concludes that the husband has a far greater earning capacity and ability than the wife, and a correspondingly greater opportunity than she has to acquire capital assets and income in the future. The court also finds that during the marriage their respective contributions to their marriage, both monetary and non-monetary, were approximately equal.
The court has considered all of the evidence and its findings in the light of the criteria embodied in General Statutes 46b-62, 46b-81, 46b-82 and 46b-84, and orders: CT Page 200
A decree dissolving the marriage may enter on the ground of irretrievable breakdown.
Joint legal custody of the minor child, Kippery Paul, is awarded to the parties; he shall reside with the mother Mondays through Fridays and during the fourth weekend of each month, and with his father the other weekends of the month from Saturday afternoons to Monday mornings, when father shall bring him to school Kippery shall be with his maternal grandfather, Mr. Galor, from Friday, after school, to Saturday noon. These periods may be suspended by each parent on four occasions each, during each calendar year. During the week of the fourth weekend set out for mother, Kippery shall be with father Wednesday after school to Thursday morning.
During the school summer vacation, the boy shall reside with each parent for consecutive two-week periods, and the weekend visitation with the parties shall be suspended.
The parents shall alternate the following holiday periods: Thanksgiving from Wednesday after school to Monday morning with father in even-numbered years; with mother in odd-numbered years. Christmas school vacation to 10 a.m., December 25, with mother in even-numbered years; with father in odd-numbered years. December 25, 10 a.m. through the morning after New Year's Day, with mother in odd-numbered years; with father in even-numbered years.
Other school vacations shall be alternated, with father having the first in 1994. Kippery shall be with his mother on Mother's Day, with his father on Father's Day, and share some time with each on his birthday. In the event any special or holiday visitation period is in conflict with regular visitation, the special or holiday visitation shall take precedence, and, in the event father's weekend with his son is immediately followed by a legal holiday celebrated on Monday, then Kippery shall remain with father until Tuesday morning.
The mother shall be entitled to make all non-emergency medical decisions, and all educational and extracurricular decisions (such as summer camp, musical or religious education, boy scouts, etc.), respecting said child, only after consultation with the father. CT Page 201
If either parent intends to move to a place more than a fifty (50) mile in radius from their present residence or any subsequent residence, such parent shall give the other one hundred twenty (120) days written notice of such intention. Each parent shall keep the other informed of any changes in address, telephone numbers, and itineraries of out-of-state trips with the child. The mother shall forward to father, promptly upon receipt, by her, copies of all medical and school reports relating to their son.
Both parents shall participate forthwith in a parenting, education program pursuant to Public Act 93-319.
The plaintiff shall pay child support in the amount of $200 per week to the defendant and be entitled to claim the dependency exemption for the child for both federal and state income tax purposes. Wife shall cooperate with this claim. In the light of the husband's substantial assets, earning capacity and income, the court finds that it would be inequitable or inappropriate to apply the child support guidelines mechanically.
The defendant wife shall take, have and own, free of any claims of the husband, the following: the real estate known as No. 1002-1003 Pequot Avenue, New London, Connecticut, and No. 43 Pequot Road, Montville, Connecticut, subject to the mortgages thereon, which she shall pay and save the husband harmless therefrom; her IRA accounts, her 1988 Jaguar motor vehicle, her jewelry, her personal effects and furnishings, and the furniture and appliances located at the No. 1002-1003 Pequot Avenue dwelling.
The alimony arrearage of $7,000 shall be paid by husband to wife at the rate of $500 per month, beginning one month from the date hereof until paid. The husband's motion to modify the alimony on the ground of a substantial change of circumstances is denied, as he has adduced no credible evidence of such change.
The plaintiff shall pay to the wife as lump sum alimony the sum of $180,000 in equal monthly payments of $1,000 commencing January 1, 1995 and biennial installments of $20,000 each, commencing January 1, 1996, until paid. Said lump sum alimony shall be secured by a mortgage deed and judgment lien on all of the real estate set out to the plaintiff in this decree, and his interests therein, whether solely owned, owned in the CT Page 202 name of a joint venture or partnership or as tenants in common or with the right of survivorship with others. Said mortgage deed and judgment lien shall provide for a thirty day default clause; that interest shall accrue on the unpaid balance at the rate of five (5%) percent per annum on the unpaid balance, until fully paid, in the event of default; for acceleration of the unpaid installments in the event of default; for attorney's fees; that a default in any prior encumbrance shall constitute a default of the mortgage deed/judgment lien, and that the wife shall be named as a loss payee on applicable property casualty insurance. Said security interest shall also provide that the plaintiff shall be entitled to a partial release of said lien as to any parcel or interest which is the subject of a good faith sale or refinance, provided husband is not then in default of his obligation hereunder, and further provided that the wife shall be entitled to one-half (1/2) of the net proceeds of any such sale or refinance of such property or of husband's fractional or partnership interest therein, after the payment of any prior encumbrances, real estate taxes and customary closing costs. Any such payments shall be applied to the unpaid balance of the alimony installments due in the inverse order of their maturity.
The wife shall be solely liable for all of the liabilities and debts shown on Schedule 3 of her financial affidavit.
The husband shall take, have and own, free of any claims of the wife, except the security interest above described and the family home which is assigned to the wife, all of the real property, partnerships and joint venture interests therein, shown on his financial affidavit, including 24 Norwich Avenue,14-18 Main Street and 20 Main Street, Colchester, Connecticut; 2 Captain's Walk, 9 Pearl Street and 6 Mitchell Court, New London, Connecticut; Port City Realty, New London, Connecticut; 98 Colony Road, Jupiter, Florida; and High Country Estates, Ledyard and Tolland, Connecticut. He shall pay and save harmless the wife from any notes, mortgages or other obligations relating to said properties which she may be liable upon, and shall also be responsible for any individual debts listed on Schedule 3 of his financial affidavit. He shall also take, have and own, free of wife's claims: his common stock in Thames Landing Oyster House, Inc., his IRA account, his checking and savings accounts, his 1989 Ford truck, his personal effects and furnishings, his jewelry and Rolex watch. Any personal property not specifically referred to herein, in either party's possession which is claimed CT Page 203 by the other, by agreement of the parties, shall be submitted to binding arbitration before Attorney Barbara Quinn, or such other person mutually agreeable. The court retains jurisdiction of this issue.
Although the court notes that the husband shows no life insurance on his financial affidavit, he is ordered to provide such life insurance on his life, in the face amount of $100,000 and maintain the defendant thereon as irrevocable beneficiary, and not impair the same, so long as any alimony or child support obligation remains outstanding.[7] The husband shall execute and deliver an authorization directed to said life insurance company so that the wife may deal directly with it to determine the good standing of said policy.
The husband shall maintain his present health insurance policy for the benefit of the parties' child, and the parents shall equally share any unreimbursed or uncovered medical bills for said child. An order pursuant to General Statutes 46b-84 (c) shall enter. In addition, the husband shall permit the wife to convert coverage under said policy for her benefit under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) for the statutory period at the wife's sole expense.
The wife shall hold as trustee for the parties' son, Kippery, the following items: a coin collection, Series E bonds, and zero coupon bonds.
Each party shall pay his or her own attorney's fees, and the court orders each to pay the child's attorney the sum of $4,000 in equal payments of $250 per month each, commencing February 1, 1994, until paid.
The husband shall vacate the premises by January 17, 1994, and the wife shall have sole and exclusive possession thereof and the contents therein. In the event of an appeal, the orders relating to custody, visitation, child support and the possession of the residence shall not be stayed. See Yontef v. Yontef, supra.
All documents and other instruments required to be executed and delivered by the parties to effect the orders herein shall be done within thirty days hereof.
Teller, J. CT Page 204